UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

KENNETH FRANKLIN LOWE,

Plaintiff,

v.

ANDREW SAUL, Commissioner of Social Security,

Defendant.

No. 1:19-cv-00424-GSA

**ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF COMMISSIONER OF SOCIAL SECURITY AND AGAINST PLAINTIFF**

I.      **Introduction**

Plaintiff Kenneth Franklin Lowe ("Plaintiff") seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for disability insurance benefits pursuant to Title II of the Social Security Act.  The matter is currently before the Court on the parties' briefs which were submitted without oral argument to the Honorable Gary S. Austin, United States Magistrate Judge.[1]  *See* Docs. 15, 18 and 19.  Having reviewed the record as a whole, the Court finds that the ALJ's decision is supported by substantial evidence and applicable law. Accordingly, Plaintiff's appeal is denied.

///

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge.  *See* Docs. 7 and 8.

## II.  Procedural Background

In February 2012, Plaintiff applied for disability insurance benefits.  AR 23.  The claim was denied in July 2012.  AR 23.  Plaintiff did not request reconsideration and the ALJ in the above-captioned case determined that the prior determination was *res judicata*.  AR 23.

On October 3, 2012, Plaintiff filed an application for disability insurance benefits alleging disability beginning November 27, 2011.  AR 23.  The Commissioner denied the application initially on March 22, 2013, and following reconsideration on November 5, 2013.  AR 23.

On November 14, 2013, Plaintiff filed a request for a hearing.  AR 23.  Administrative Law Judge Danny Pittman presided over an administrative hearing on March 12, 2015.  AR 42-77.  Plaintiff appeared and was represented by an attorney.  AR 42.  On April 20, 2015, the ALJ denied Plaintiff's application.  AR 23-35.

The Appeals Council denied review on August 2, 2016.  AR 11-17.  On April 1, 2019, Plaintiff filed a complaint in this Court.  Doc. 1.

## III.  Factual Background

### A.  Medical Records

While working on a road construction project in Tulare County, California in March 2010, Plaintiff was run over by an eighteen-wheel semi-truck and trailer.  AR 412.  He was transported by helicopter to Community Regional Medical Center in Fresno where doctors diagnosed an open-book pelvic fracture,[2] multiple comminuted sacral fractures, scrotal hematoma, hemorrhage and urethral injuries.  AR 412, 420.  Doctors immediately performed a cystostomy but postponed surgery to reduce the fractures until Plaintiff's condition stabilized.  AR 424, 426-28.  Following recovery from surgery performed by orthopedist Eric Lindvall, M.D., Plaintiff was discharged to a rehabilitation center.  AR 462.

///

---

[2] An open-book pelvic fracture describes a fracture that significantly disrupts the pelvic ring, that is, the bony structure composed of the sacrum, coccyx, and the three innominate bones (ilium, ischium and pubis) that form the acetabulum (the socket portion of the hip joint).  An open-book fracture combines an anterior pelvic injury that widens the pelvic symphysis with posterior pelvic injuries consisting of fractures and ligamentous injuries.  Fractures of the pelvis potentially result in serious injury to the internal organs of the lower pelvis and the associated nerves and blood vessels.  Bryan Gerecht, M.D., C.M.T.E., Clinical Management of Deadly Pelvic Injuries, www.jems.com/2014/12/02/clinical-management-deadly-pelvic-injuri/ (accessed May 12, 2020).

1    John B. Edwards, M.D., a specialist in physical medicine and rehabilitation, was

2  Plaintiff's primary treating physician for workers' compensation.  The record includes progress

3  reports from April 2010 through October 2014.  AR 474-86, 557-61, 565-70, 607-611.  Dr.

4  Edwards' notes reflect continuing efforts to achieve effective pain management and adequate

5  sleep, and note ongoing urological treatment by other physicians to address Plaintiff's problems

6  with urination and sexual function.  AR 476, 479, 481-85, 557-61, 565-70.  Plaintiff was

7  performing modified work by April 2010. AR 484.  In May 2011, Dr. Edwards noted that

8  Plaintiff was doing well with pain control and modified work.  AR 482.  But in July 2011, Norco

9  was not relieving Plaintiff's pain, Plaintiff was not sleeping at night and he was becoming

10  depressed and socially isolated.  AR 481.

11    At the end of October 2011, Dr. Edwards opined that Plaintiff's condition was permanent

12  and stationary.  AR 477-78.  Plaintiff continued to experience chronic back and pelvic pain and

13  sleeping problems and to receive urological treatment.  AR 477.  Plaintiff acknowledged that he

14  was depressed but was not yet willing to discuss his depression or consider possible

15  antidepressant medication.  AR 477.  His medications included MS IR[3] and Trazadone.[4]  AR 477.

16  Plaintiff had returned to modified work but could not lift more than fifty pounds or use a shovel.

17  AR 477.

18    In January 2012, Dr. Edwards rejected several proposed job placements (unidentified in

19  the record) that would require prolonged sitting and standing since those activities would increase

20  Plaintiff's pain and force him to use larger amounts of medication.  AR 474.

21    In January 2012, urologist Barton H. Wachs, M.D., evaluated Plaintiff for the workers'

22  compensation provider.  AR 494-96.  Dr. Wachs reported that Plaintiff continued to experience

23  urinary incontinence, depression and vasculogenic and neurogenic erectile dysfunction which did

24  not respond to medication.  AR 494.

25  ///

26

27  [3] MS IR (morphine) is prescribed to treat moderate to severe pain.
https://medlineplus.gov/druginfo/meds/a682133.html (accessed May 12, 2020).
[4]  Trazadone is an antidepressant sometimes prescribed to treat insomnia.

28  https://medlineplus.gov/druginfo/meds/a681038.html (accessed May 12, 2020).

1    In June 2012, orthopedist Richard Byrne, M.D., evaluated Plaintiff for the workers'

2  compensation provider.  AR 503-16.  Dr. Byrne noted that Plaintiff had briefly returned to

3  modified work but was medically retired from his job in November 2011 because of permanent

4  lifting restrictions.  AR 505.  Plaintiff continued to experience severe pelvic pain about ten days

5  monthly.  AR 506.  The pain was both sharp and aching and affected Plaintiff's left groin area,

6  proximal thigh, lateral aspect of the thigh, and bilateral buttocks which were numb.  AR 506.

7  Plaintiff experienced chronic tingling in his sacrum and left thigh.  AR 506.  He was depressed by

8  erectile dysfunction, lack of sexual activity and permanent inability to play sports.   AR 506.

9    Plaintiff's ability to stand, walk and sit was variable.  AR 506.  He walked with difficulty

10  and could not run.  AR 507.  Plaintiff had difficulty dressing himself, standing, sitting, climbing

11  stairs, lifting a bag of groceries, performing sexually and sleeping.  AR 507.  His gait was nearly

12  normal but slow. AR 509.

13    Dr. Byrne's examination revealed that Plaintiff had slightly positive (45 degrees) straight

14  leg raising and was able to squat about halfway.  AR 510.  Sensation in the lateral left thigh and

15  left buttocks area was decreased.  AR 510.  There was diffuse tenderness over the sacrum and

16  coccyx.  AR 510.  Plaintiff had no apparent muscle atrophy.  AR 510.  Dr. Byrne opined that

17  Plaintiff could not perform heavy lifting, jump, run, or engage in repetitive squatting, kneeling or

18  crawling.  AR 513.

19    At a periodic examination in September 2012, Dr. Lindvall noted firmness in Plaintiff's

20  left groin area.  AR 537.  X-ray imaging indicated heterotopic ossification through the

21  symphyseal pubic area extending down inferiorly into the groin region.  AR 537.  Dr. Lindvall

22  declined to perform surgery to remove excessive bone growth, favoring continued monitoring of

23  the condition.  AR 537-38.

24    In February 2014, Dr. Edwards noted that Plaintiff's pain was no longer well controlled,

25  resulting in inactivity.  AR 568. Dr. Edwards prescribed a trial of Duragesic.  AR 568. At the

26  same time, Plaintiff wanted to work but his pain was a barrier.  AR 568.  Although Plaintiff had

27  begun treatment with psychologist Edwyn Ortiz-Nance, Psy.D., Plaintiff's depression continued

28  to worsen.  AR 568.

1        After an unsuccessful trial of Duragesic, Dr. Edwards tried MS Contin, which made

2    Plaintiff sleepy and "zombied out." AR 565. Plaintiff was experiencing daily pelvic pain and

3    exhibiting irritability. AR 565. The doctor prescribed a trial of Norco and asked Plaintiff to

4    request that Dr. Nance prescribe an SSRI antidepressant. AR 565.

5        Although Dr. Ortiz-Nance first treated Plaintiff in 2011, the record includes Dr. Ortiz-

6    Nance's treatment notes from January through November 2014. AR 577-600, 616, 623-45. Dr.

7    Nance and his staff provided psychotherapy and neurofeedback intended to help relieve pain and

8    to enhance relaxation and sleep. AR 577-600.

9        On January 7, 2015, Dr. Ortiz-Nance responded to questions from the workers'

10   compensation provider. AR 612-13. He diagnosed depressive disorder due to another medical

11   condition: severe industrial accident (moderate); anxiety disorder due to another medical

12   condition: severe industrial accident (moderate); insomnia disorder with medical co-morbidity

13   (persistent) erectile disorder (severe); and, enuresis (nocturnal and diurnal). AR 612. The doctor

14   explained that Plaintiff's depression and anxiety reflected his loss of general functions that

15   impede self-regulation and engagement in the adult activities he had customarily enjoyed before

16   his accident. AR 612.

17       The effects of Plaintiff's physical impairments exacerbated his depression and anxiety.

18   AR 612. Plaintiff felt incapable of socializing for fear of a urinary accident and struggled to

19   accept his inability to engage in sexual intercourse or to have and raise children. AR 612.

20   Plaintiff experienced constant pain but sought to avoid being constantly medicated which resulted

21   in nausea, sleepiness and feeling like a "zombie." AR 612. His sleep was of poor quality and

22   quantity. AR 612. Plaintiff's condition had changed him physically and mentally and altered his

23   self-image. AR 612.

24            **B. Plaintiff's Testimony**

25       Plaintiff (born June 5, 1968) lived with his mother, who was retired. AR 46-47. He

26   received medical retirement benefits and worker's compensation insurance. AR 47. Plaintiff had

27   a current driver's license and drove short distances when he felt able. AR 47-48.

28   ///

1    Plaintiff was certified as a psychiatric technician and worked in that capacity for the State

2 of California for twelve years.  AR 48.  He also worked for a time in the drug dependency ward

3 of a hospital.  AR 51.  Plaintiff later graduated from the police academy and worked as a police

4 officer and as a deputy in the county jail.  AR 48, 52.  He worked part time at a local grocery

5 store and as a school bus driver.  AR 50, 51   Plaintiff last worked as a heavy equipment operator

6 for the county road department, the job on which he was injured.  AR 52.  At the time of the

7 administrative hearing Plaintiff occasionally drove for a friend's limousine company.  AR 49.

8    Plaintiff testified that he was unable to work because he suffered debilitating pain in his

9 left hip and lower back about ten days monthly.  AR 53, 56.  Nothing triggered or worsened the

10 pain, which Plaintiff described as just a part of the changes resulting from his injuries.  AR 57.

11    Plaintiff had prescriptions for pain medications to be taken as needed.  AR 54.  Although

12 these did not really stop the pain they turned Plaintiff into a "zombie" and made him throw up.

13 AR 54.  Plaintiff expressed concern about overusing addictive drugs and the long-term effects of

14 the medications on his kidneys and liver.  AR 54.  The prescription sleep medications were no

15 longer effective.  AR 54.

16    Although Plaintiff tried to avoid taking pain medication, he took prescription morphine

17 when his pain became unbearable.  AR 53.  At those times he was confined to bed from two to

18 four days,  AR 53.  Plaintiff also experienced continuing problems with erectile disfunction,

19 sleeping and loss of bladder control, which was embarrassing.  AR 53-54, 67.

20    Before the accident Plaintiff frequently rode horseback, volunteered for search and rescue

21 with the sheriff's department and rode his horse in parades.  AR 57. Following the accident he

22 tried to continue to participate with a mounted group of sheriffs (the "Sheriff's Posse") to remain

23 active and continue his social connections.  AR 57-58.  Although he had tried to continue riding

24 in short parades he found that he experienced several pain for days in bed after doing so and

25 stopped riding.  AR 57.  Plaintiff's injuries also left him unable to ride his motorcycle and to

26 participate in sports such as volleyball, softball and bicycling.  AR 59.

27    Plaintiff disputed the report of consultative psychiatrist Dr. Barrett, who stated that

28 Plaintiff was able to perform all the necessary work on his ranch.  AR 58.  Plaintiff testified that

1   he had performed all of the ranch work before the accident but now had to hire people to do the

2   heavy work that he and his mother could not perform, such as cleaning up horse manure.  AR 58-

3   59.

4          Plaintiff received mental health treatment from Dr. Nance.  AR 55. Since the accident,

5   Plaintiff noticed that he had difficulty concentrating but no impairment of his memory.  AR 59.

6          **IV.    Standard of Review**

7          Pursuant to 42 U.S.C. §405(g), this court has the authority to review a decision by the

8   Commissioner denying a claimant disability benefits.  "This court may set aside the

9   Commissioner's denial of disability insurance benefits when the ALJ's findings are based on

10  legal error or are not supported by substantial evidence in the record as a whole."  *Tackett v.*

11  *Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted).  Substantial evidence is evidence

12  within the record that could lead a reasonable mind to accept a conclusion regarding disability

13  status.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971).  It is more than a scintilla, but less

14  than a preponderance.  *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (internal citation

15  omitted).  When performing this analysis, the court must "consider the entire record as a whole

16  and may not affirm simply by isolating a specific quantum of supporting evidence."  *Robbins v.*

17  *Social Security Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citations and internal quotation marks

18  omitted).

19         If the evidence reasonably could support two conclusions, the court "may not substitute its

20  judgment for that of the Commissioner" and must affirm the decision.  *Jamerson v. Chater*, 112

21  F.3d 1064, 1066 (9th Cir. 1997) (citation omitted).  "[T]he court will not reverse an ALJ's

22  decision for harmless error, which exists when it is clear from the record that the ALJ's error was

23  inconsequential to the ultimate nondisability determination."  *Tommasetti v. Astrue*, 533 F.3d

24  1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

25         **V.    The Disability Standard**

26         To qualify for benefits under the Social Security Act, a plaintiff must
            establish that he or she is unable to engage in substantial gainful
27          activity due to a medically determinable physical or mental
            impairment that has lasted or can be expected to last for a continuous
28          period of not less than twelve months.  42 U.S.C. § 1382c(a)(3)(A).

> An individual shall be considered to have a disability only if . . . his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §1382c(a)(3)(B).

To achieve uniformity in the decision-making process, the Commissioner has established a sequential five-step process for evaluating a claimant's alleged disability.  20 C.F.R. §§ 416.920(a)-(f).  The ALJ proceeds through the steps and stops upon reaching a dispositive finding that the claimant is or is not disabled.  20 C.F.R. §§ 416.927, 416.929.

Specifically, the ALJ is required to determine: (1) whether a claimant engaged in substantial gainful activity during the period of alleged disability, (2) whether the claimant had medically determinable "severe impairments," (3) whether these impairments meet or are medically equivalent to one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1, (4) whether the claimant retained the residual functional capacity ("RFC") to perform his past relevant work, and (5) whether the claimant had the ability to perform other jobs existing in significant numbers at the national and regional level.  20 C.F.R. § 416.920(a)-(f).

**VI.    Summary of the ALJ's Decision**

The ALJ found that Plaintiff had not engaged in substantial gainful activity since the application date of November 27, 2011.  AR 25.  His severe impairments included: depressive disorder; status post open book pelvic fracture; numerous sacral fractures with left sacroiliac joint subluxation, status post open reduction and internal fixation; and urethral tears, status post repair.  AR 25-26.  None of the severe impairments met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526).  AR 26-27.

The ALJ concluded that Plaintiff had the residual functional capacity to perform a range of light work as defined in 20 C.F.R. § 404.1567(b).  AR 27.  Plaintiff was able to lift and/or carry ten pounds frequently and twenty pounds occasionally; stand and/or walk for six hours in an

eight-hour workday; sit for six to eight hours in an eight-hour workday; and occasionally balance, stoop, kneel, crouch, crawl and climb.  AR 27.   Plaintiff could not run or jump.  AR 27.  He was able to perform simple, routine, and complex tasks in an environment with limited public contact. AR 27.

Plaintiff was not able to perform any past relevant work.  AR 33.  The Medical Vocational Rules supported a finding that Plaintiff was not disabled whether or not he had transferable job skills.  AR 33-34.  Considering Plaintiff's age, education, work experience and residual functional capacity, jobs that Plaintiff could perform existed in significant numbers in the national economy. AR 34.  Accordingly, the ALJ found that Plaintiff was not disabled at any time from November 27, 2011, through April 20, 2015, the date of the decision.  AR 34-35.

**VII.   Sufficient Evidence Supported the Residual Functional Capacity Determination**

Plaintiff contends that the ALJ erred in rejecting the opinions of his treating physicians, Dr. Edwards and Ortiz-Nance, Psy.D.  The Commissioner counters that the ALJ's analysis of Plaintiff's residual functional capacity met applicable legal requirements.

A.   **Determining Residual Functional Capacity**

"Residual functional capacity is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p.  The residual functional capacity assessment considers only functional limitations and restrictions which result from an individual's medically determinable impairment or combination of impairments.  SSR 96-8p.

A determination of residual functional capacity is not a medical opinion, but a legal decision that is expressly reserved for the Commissioner. See 20 C.F.R. §§ 404.1527(d)(2) (residual functional capacity is not a medical opinion), 404.1546(c) (identifying the ALJ as responsible for determining residual functional capacity). "[I]t is the responsibility of the ALJ, not the claimant's physician, to determine residual functional capacity." *Vertigan v. Halter*, 260 F.3d

1044, 1049 (9th Cir. 2001).  In doing so the ALJ must determine credibility, resolve conflicts in medical testimony and resolve evidentiary ambiguities.  *Andrews v. Shalala*, 53 F.3d 1035, 1039-40 (9th Cir. 1995).

"In determining a claimant's [residual functional capacity], an ALJ must consider all relevant evidence in the record such as medical records, lay evidence and the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment."  *Robbins*, 466 F.3d at 883.  *See also* 20 C.F.R. § 404.1545(a)(3) (residual functional capacity determined based on all relevant medical and other evidence).  "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting evidence, stating his interpretation thereof, and making findings."  *Magallanes v, Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)).

The opinions of treating physicians, examining physicians, and non-examining physicians are entitled to varying weight in residual functional capacity determinations.  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual.  *Id.*; *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996).  The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a non-examining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990).  An ALJ may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons.  *Lester*, 81 F.3d at 831.  In contrast, a contradicted opinion of a treating professional may be rejected for "specific and legitimate" reasons.  *Id.* at 830.  However, the opinions of a treating or examining physician are "not necessarily conclusive as to either the physical condition or the ultimate issue of disability." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999).

///

### B. <u>Medical Opinions</u>

#### 1. <u>Agency Physicians</u>

In the initial review of the prior application (July 2012), surgeon Roger Fast, M.D., opined that Plaintiff was able to perform modified medium work.  AR 85, 88.  E. Aquino-Caro, M.D., opined that Plaintiff generally did not have significant limitation in mental function except for limitations of memory and understanding, including moderate limitation in understanding and remembering detailed instructions and the ability to sustain concentration for two hours.  AR 89-90.

In the initial review of the pending application (March 2013), neurologist Lydia Kiger, M.D., opined that Plaintiff had the residual functional capacity for light work.  AR 100.  G. Johnson, M.D., opined that Plaintiff had moderate limitation of social interaction, including the ability to interact appropriately with the general public, and  to accept instruction and respond appropriately to criticism from supervisors.  AR 104-05.

On reconsideration (October 2013), internist D. Lee, M.D., opined that Plaintiff was generally able to perform light work and occasionally stoop, kneel, crouch and climb ramps, stairs, ropes, ladders and scaffolds.  AR 119.  Pamela Hawkins, Ph.D., agreed with Dr. Johnson's opinion of Plaintiff's mental residual functional capacity.  AR 120-21.

#### 2. <u>Consultative Orthopedic Opinion</u>

In June 2012, Fariba Vesali, M.D., completed a comprehensive orthopedic evaluation, AR 525-28.  Dr. Vesali noted that except for mild external rotation of the left foot, Plaintiff's gait was normal.  AR 526.  Plaintiff was able to take off his own shoes and get on and off the examination table with no difficulty.  AR 526.  The physical examination was generally within the normal range except for tingling of the lateral aspect of the left thigh.  AR 527.

///

Dr. Vesali opined that Plaintiff was able to sit, stand or walk for six hours in an eight-hour workday with normal breaks, and to perform frequent postural activities.  AR 527-28.  He could lift 50 pounds occasionally and 25 pounds frequently.  AR 528.

### 3.   Consultative Psychiatric Opinion (June 2012)

Psychologist Roger A. Izzi completed a psychiatric evaluation.  AR 531-34.  Dr. Izzi observed agitation and dysphoric mood.  AR 532.  Plaintiff reported that his psychological problems had arisen after his accident.  AR 532.  Plaintiff performed within the normal range on the Folstein Mini Mental Status Examination.  AR 533.  Dr. Izzi diagnosed mood disorder, NOS and pain disorder associated with a medical condition.  AR 533.  He opined that Plaintiff's GAF was 65.[5]  AR 533.

Dr. Izzi wrote, in pertinent part:

> The results of the present mental status examination suggest that cognitive functioning remains intact,  His mood disorder will fluctuate as his subjective perception of pain fluctuates.  There is likely to be depression secondary to awareness of loss of functional ability.  The claimant did report that he attempted to return to work; however, the employer was not able to accommodate his work restrictions.
>
> Clinical interview indicates that the claimant is not having any difficulty caring for basic hygiene.  The present evaluation suggests, that on a purely psychological basis, the claimant does appear capable of performing a simple and repetitive task on a consistent basis over an eight-hour period.  His ability to get along with peers or be supervised in [a] work-like setting would be moderately limited by his mood disorder.  The claimant's mood disorder will fluctuate as his subjective perception of pain fluctuates.  Any significant fluctuation of mood would limit the claimant's ability to perform a complex task on a consistent basis over an eight-hour period.  On a purely psychological basis, the claimant appears to be capable of responding to usual work session situations regarding attendance and

---

[5] The Global Assessment of Functioning (GAF) scale is a rating from 0 to 100 and considers psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness. *Diagnostic and Statistical Manual of Mental Disorders*, 32-35 (4th ed. American Psychiatric Association 1994). A GAF of 61-70 corresponds to some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational or school functioning (e.g., occasional truancy or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. *Id*.

safety issues.  On a purely psychological basis, the claimant appears capable of dealing with changes in a routine work setting.

AR 533-34.

### 4      Consultative Psychiatric Examination (2013)

Psychiatrist Michael S. Barnett, M.D., prepared a psychiatric evaluation of Plaintiff in February 2013.  AR 551-53.  Plaintiff was irritable and "quire demanding about needing Social Security Disability" because he was "broke."  AR 551.  According to Dr. Barnett, Plaintiff and his mother "have a ranch with dogs and horses and he does all the ranch work."   AR 551.

Dr. Barnett observed that Plaintiff limped but showed no signs of chronic mental illness or involuntary movements.  AR 551.  Plaintiff explained that his depression resulted "because he cannot get a job and no one wants to hire him."  AR 551.  Because of his physical limitations, Plaintiff's lifestyle had "drastically" changed since his accident.  AR 551.  Plaintiff reported difficulty sleeping, erectile dysfunction and poor energy and concentration.  AR 551.  He was irritable and withdrawn and no longer enjoyed activities.  AR 551.

Dr. Barnett diagnosed major depressive disorder, single episode, severe, without psychotic symptoms; adjustment disorder, with depressed mood; personality disorder, NOS; and physical limitations and pain.  AR 552.  The doctor opined that Plaintiff's GAF was 57.[6]  AR 552.  The doctor wrote:

> [Plaintiff] would benefit from treatment with antidepressant medication.  He looks for work and is doing significant work around his ranch.  He exhibited irritability and demanded he get Social Security Disability.  He is very upset about the limitations imposed on his life by his physical problems.  These symptoms would greatly interfere with his ability to do work-related tasks in an eight hour work situation,
>
> The claimant would be able to understand or remember simple or complex work-related instructions and tasks.  The claimant would be able to sustain focused attention and concentration long enough to complete work-related tasks in a timely and appropriate way without special or additional supervision.  The claimant may have difficulty being able to interact independently, appropriately and effectively with coworkers, supervisors and the public because of his irritability and demanding attitude.    The claimant would have difficulty

---

[6] A GAF of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty is social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers).  *Diagnostic and Statistical Manual of Mental Disorders* at 34.

adapting to changes, hazards or stressors in the work environment.

AR 552-53.

Finally, Dr. Barnett opined that Plaintiff's prognosis was guarded due to possible limitations of his access to treatment and motivation to follow through with treatment.  AR 553.

### 5.   Mental Residual Functional Capacity Statements

In July 2014, Edwyn Ortiz-Nance, Psy.D., Plaintiff's treating psychologist, completed a mental residual functional capacity statement.  Dr. Nance diagnosed depressive disorder not otherwise specified, anxiety, enuresis, polyneuropathy and problems related to the social environment.[7]  AR 573.  Based on his observations of Plaintiff's behavior in the course of treatment, the doctor estimated Plaintiff's GAF to be 50.  AR 573, 576.

Dr. Ortiz-Nance opined that Plaintiff's mental health limitations would interfere with the following mental abilities fifteen or more percent of the time: perform activities within a schedule, maintain regular attendance, and be punctual and within customary tolerances; work in coordination with or in proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; and, respond appropriately to changes in the work setting. AR 574-75.  Plaintiff's mental health limitations would interfere with the following mental abilities ten or more percent of the time: maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, and be aware of normal hazards and take appropriate precautions.  AR 575.  Dr.Ortiz- Nance opined that Plaintiff's mental health limitations would interfere with the following mental abilities five percent of the time: maintain attention and concentration for extended periods of time; accept instructions and respond appropriately to criticism from supervisors; and, travel in unfamiliar places or make plans independently of others. AR 574-75.

Dr. Ortiz-Nance opined that Plaintiff's perception of pain was exacerbated by self-consciousness of his injury, fear of embarrassing himself, and fear of failing at activities that he

---

[7] Portions of Dr. Nance's responses are difficult to read because of poor copy quality.

1   could formerly do well.  AR 575.  He estimated that Plaintiff would be off task more than thirty

2   per cent of the workday, be absent more than six days monthly, and be unable to complete the

3   workday more than six days monthly.  AR 575.

4       In a mental impairment questionnaire completed in February 2015, Dr.Ortiz- Nance

5   diagnosed moderate depressive disorder due to severe industrial accident; moderate anxiety

6   disorder due to severe industrial accident; insomnia; erectile disorder; and, enuresis.  AR 617.  He

7   estimated Plaintiff's GAF to be 50.[8]  AR 617.  Symptoms included anhedonia or pervasive loss of

8   interest in all activities; feelings of guilt or worthlessness; mood disturbance; persistent

9   disturbances of mood or affect; apprehensive expectation; emotional withdrawal or isolation;

10  emotional lability; easy distractibility; and, sleep disturbance.  AR 618.

11      Dr. Ortiz-Nance noted that Plaintiff's inability to control his bladder had led to social

12  embarrassment and isolation.  AR 616.  His prognosis was poor.  AR 616.  In the doctor's

13  opinion, Plaintiff was unable to meet competitive standards to maintain regular attendance and be

14  punctual within customary, usually strict tolerances; work in coordination with or in proximity to

15  others without being unduly distracted; perform at a consistent pace without an unreasonable

16  number and length of rest periods; respond appropriately to changes in a routine work setting'

17  and, deal with normal work stress.  AR 619.  Plaintiff's ability to sustain an ordinary routine

18  without special supervision was seriously limited.  AR 619.  His ability to complete a normal

19  workday and workweek without interruptions from psychologically based symptoms was limited

20  but satisfactory.  AR 619.

21      Dr. Ortiz-Nance explained that Plaintiff had constant pain and on some days was unable to

22  get out of bed.  AR 619.  Plaintiff's enuresis had led to fear of social interactions in any setting

23  and in turn, a loss of personal identity and future plans for work and family.  AR 619.  Dr. Ortiz-

24  Nance opined that Plaintiff's fear was not unreasonable.  AR 620.  In Dr. Ortiz-Nance's opinion,

25  Plaintiff had no useful ability to interact with the general public and was unable to meet

26  competitive standards on maintaining socially appropriate behavior and basic standards of

27
28  [8] AGAF of 41 to 50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational or school functioning (e.g., no friends, inability to keep a job).  *Diagnostic and Statistical Manual of Mental Disorders* at 34.

1   neatness and cleanliness.  AR

2   ///

3   620. In addition, Plaintiff's anxiety and depression heightened his sense of pain and increased the

4   chances of Plaintiff's experiencing a "urine event."  AR 620.

5          In May 2015, following the ALJ's denial of Plaintiff's application for benefits, Dr. Ortiz-

6   Nance provided a letter to the Appeals Council to address Plaintiff's perception that he had been

7   denied disability benefits based on his ability to occasionally ride a horse and to help his mother

8   maintain the family's small farm.  AR 646-47.  The letter contrasted Plaintiff's image of himself

9   as a person who should work and support himself with the reality of Plaintiff's inability to

10  perform strenuous activities on a sustained daily basis.  AR 646-47. Dr.Ortiz- Nance wrote:

> Because of [Plaintiff's] deteriorating self-esteem and self-worth, I found him during session[s] becoming more and more insular (losing contact with friends, refusing to try and continue activities he might be able to accomplish, and avoiding one on one social interactions). He was asked by me to try and normalize his days and to try and maintain typical activities as best as possible given his limitations.
>
> Based on observation and [Plaintiff's] account, he was able to periodically help his mother on the farm and periodically rode his horse.  Regarding his horse it is notable that [Plaintiff], at one time (just prior to the accident) rode his horse weekly and as part of the Sheriff's Posse and rode in as many as 17 parades a year.  The number is now reduced to perhaps two annually.
>
> There is an issue as to [Plaintiff's] ability to work on a full or part time basis.  [Plaintiff] has shared on more than one occasion, during our check ins that it may take him from three to four days to recover from the activities he attempts.  These recovery times take a toll on [Plaintiff's] emotional and psychological wellbeing as they serve as a comparison to his abilities prior to the event,  They also suggest that a work accommodation would require several days of recovery time for each partial day worked (this does not include consideration of his enuresis which causes him anxiety and constant embarrassment).
>
> It is believed that [Plaintiff] is not able to navigate or endure the rigors (physically, socially or psychologically) that are typically associated with a typical workday.  It may also be that any accommodation may not be considered reasonable by the typical employer. [Plaintiff] has occasionally worked for a relative who allows him to work periodically for a brief period of time with numerous days between the work events.
>
> AR 646-47.

16

1    ///

2    ///

3                    **6.      Physical Residual Functional Capacity Statement**

4         In June 2014, Dr. Edwards completed a physical residual functional capacity statement.

5    AR 602-05.  Dr. Edwards characterized Plaintiff's impairment as chronic back and sacral pain

6    that limited him to lifting no more than fifteen pounds, and to standing or sitting no more than one

7    hour at a time.  AR 602.  Plaintiff did not tolerate medications well and experienced sleepiness as

8    a side effect.  AR 602.  Plaintiff's physical condition was exacerbated by depression.  AR 602.

9    His pain and stress were severe enough to interfere with attention and concentration frequently.

10   AR 602.  Plaintiff had difficulty stooping, crouching and bending.  AR 603.

11        As a result of his pain, Plaintiff needed to lie down or recline for about fifteen minutes at a

12   time for a total of about one hour a day.  AR 603.  Plaintiff could sit for a total of about three

13   hours daily but would need to change position every fifteen or twenty minutes.  AR 603.  Plaintiff

14   could stand or walk for a total of about three hours daily but would need to change position about

15   every fifteen minutes.  AR 603-04.  Plaintiff was likely to need an unscheduled fifteen-minute

16   break every 90 minutes to two hours.  AR 604.

17        Plaintiff could rarely lift fifteen pounds and occasionally lift ten pounds or less.  AR 604.

18   He could occasionally carry ten to fifteen pounds.  AR 604.  Plaintiff could not push or pull arm

19   or leg controls from a sitting position.  AR 605.  He should not climb stairs, ladders, scaffolds,

20   ropes or ramps.  AR 605.

21        In Dr. Edward's opinion, Plaintiff was likely to be off task about 25 percent of the

22   workday.  AR 605.  He was likely to be absent more than five days monthly and be unable to

23   complete the workday five or more days monthly.  AR 605.

24                    C.  **The ALJ's Analysis**

25                        **1.  In General**

26        "[A]n ALJ is responsible for determining credibility and resolving conflicts in medical

27   testimony."  *Magallanes*, 881 F.2d at 750.  An ALJ may choose to give more weight to opinions

28   that are more consistent with the evidence in the record.  20 C.F.R. §§ 404.1527(c)(4) ("the more

                                                    17

1   consistent an opinion is with the record as a whole, the more weight we will give to that

2   opinion").  The ALJ considered Plaintiff's physical and mental impairments separately.

3                            **2.  Physical Impairments**

4        Addressing Plaintiff's physical impairments, the ALJ noted that despite continuing pelvic

5   pain, Plaintiff was able to walk without aids and displayed a full range of hip motion.  AR 28.  In

6   September 2012, Dr. Lindvall declined further surgery and directed Plaintiff to continue his

7   normal activities.  AR 28.  Plaintiff retained full motor strength and was able to modify and

8   perform certain activities he liked such as horseback riding.  AR 28.

9        The ALJ gave little weight to workers' compensation findings that Plaintiff was

10  temporarily to remain off work, characterizing the findings as conclusory and inconsistent with

11  other evidence in the record, specifically the direction that Plaintiff continue with normal

12  activities and Plaintiff's ability to ride horseback.  AR 28-29.

13       The ALJ gave some weight to Dr. Edward's July 2011 opinion that Plaintiff was

14  precluded from lifting more than fifty pounds and using a shovel, but could return to modified

15  work.  AR 29.  However, given Plaintiff's history of pelvic and sacroiliac fractures, the ALJ

16  limited Plaintiff to lifting and carrying twenty pounds occasionally.  AR 29.  However, the ALJ

17  gave little weight to Dr. Edwards' more restrictive June 2014 opinion, finding it to be inconsistent

18  with the evidence and with the September 2012 direction that Plaintiff resume normal activities.

19  AR 29.

20       Finding the opinion consistent with the evidence as a whole, the ALJ gave significant

21  weight to Dr. Wach's January 2012 opinion that Plaintiff could return to work at full capacity

22  without reservation or restrictions based on erectile and voiding dysfunction.  AR 29.  The ALJ

23  noted with approval that Dr. Wach's opinion was consistent with Dr. Barnett's statement that

24  Plaintiff lived on a ranch and did all the ranch work.  AR 29.

25       The ALJ gave some weight to Dr. Byrne's June 2012 opinion for workers' compensation

26  that Plaintiff was precluded from heavy lifting, running, jumping, and repetitive squatting,

27  kneeling or crawling.  AR 29.  However, the ALJ discounted the opinion because Dr. Byrne did

28  not quantify what was meant by "heavy lifting."  AR 29-30.

The ALJ also gave significant weight to Dr. Vesali's opinion that Plaintiff could lift and carry fifty pounds occasionally and 25 pounds frequently; could sit, stand and walk six hours in an eight-hour workday; and, could frequently perform postural activities.  AR 30.  Again, however, the ALJ considered the nature of Plaintiff's pelvic injuries and rejected the amount of weight that Dr. Vesali considered Plaintiff able to carry.  AR 30.

Finally, the ALJ gave significant weight to the opinions of the state agency physicians, Drs. Kiger and Lee, that Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently; sit stand and walk about six hours in an eight-hour workday; and, occasionally climb, stoop, balance kneel, crouch and crawl.  AR 30.  The ALJ stated, " No greater exertional limitations are warranted or supported by the record, especially in light of treatment reports showing full motor strength in the bilateral extremities with a full range of motion in the hips without significant discomfort."  AR 30 (citations to the administrative record omitted).

### 3.  **Mental Impairments**

In considering Plaintiff's mental impairments, the ALJ noted that the evidence indicated that Plaintiff experienced depression but was fully oriented and without psychotic symptoms.  AR 30.  Plaintiff's  memory was intact and  his scores on the Folstein Mini Mental Status exam were within the normal range.  AR 30.

Finding Dr. Ortiz-Nance's July 2014 and February 2015 opinions inconsistent with the evidence, the ALJ gave them little weight.  AR 30-31.  The ALJ noted that Dr. Ortiz-Nance's treatment records were subjective and did not include objective measure of mental functioning such as a mental status examination.  AR 31.

The ALJ gave limited weight to Dr. Barnett's opinion finding that it failed to provide a detailed basis for the conclusion that Plaintiff had difficulty interacting with others and adapting to changes.

In contrast, the ALJ gave significant weight to both Dr. Izzi's consultative report and Dr. Johnson's opinion for the state agency because  both opinions accounted for both Plaintiff's depression and his intact mental status.  AR 31-32.

### D.  **Evaluating Plaintiff's Contentions**

Contending that the ALJ misinterpreted Dr. Lindvall's September 2012 statement that Plaintiff could resume normal activities, and that Dr. Barnett mischaracterized Plaintiff's ranch activities, Plaintiff urges the Court to reverse the denial of benefits.  The Court is not required to accept Plaintiff's characterization of his treatment records or his assessment of the medical opinions.  The ALJ fully supported his determination based on multiple medical opinions and the evidence of record.  Even if this Court were to accept that the record could support Plaintiff's opinion, the record amply supports the ALJ's interpretation as well.  When the evidence could arguably support two interpretations the Court may not substitute its judgment for that of the Commissioner.  *Jamerson*, 112 F.3d at 1066.

### VIII.   The Appeal Council's Determination that New Evidence Is Not Subject to District Court Review

Finally, Plaintiff contends that the Administrative Council erred in determining that additional evidence submitted as part of his request for review did not show a reasonable probability that it would change the outcome of the hearing decision.  The evidence in question were letters from Plaintiff and his attorney presenting further argument of Plaintiff's case and a supplementary opinion from Dr.Ortiz-Nance addressing the issues of Plaintiff's performing farm maintenance and riding his horse, which Plaintiff believed had resulted in the Commissioner's denial of disability insurance benefits (AR 646-47).   The Administrative Council determination is not subject to judicial review.

The Social Security Act grants district courts jurisdiction to review only final decisions of the Commissioner. 42 U.S.C. § 405(g); *Klemm v. Astrue*, 543 F.3d 1139, 1144 (9th Cir. 2008).  An Administrative Council denial of a request for review is a non-final agency action not subject to judicial review because when review is denied, the ALJ's decision becomes the final decision of the Commissioner.  *Taylor v. Commissioner of Soc. Sec. Admin.*, 659 F.3d 1228, 1231 (9th Cir. 2011).

In limited circumstances, a claimant may submit new and material evidence to the

Administrative Council.  20 C.F.R. § 416.1470(a)(5).  The Council must consider that evidence in determining whether to review the ALJ's decision, as long as the evidence (1) relates to the period on or before the ALJ's decision; (2) there is reasonable probability that the additional evidence would change the outcome of the decision; and, (3) the claimant has established good cause for not complying with the requirements of 20 C.F.R. § 416.1435.  *Id.*  Regulatory bases for establishing good cause include: (1) the agency action misled the claimant; (2) the claimant had physical, mental, educational or linguistic limitations that prevented the claimant from informing the Commissioner or submitting the evidence earlier; or, (3) an unusual, unexpected or unavoidable circumstance beyond the claimant's control prevented the claimant from informing the Commissioner or providing the evidence earlier.  20 C.F.R. § 416.1470(b).  Unusual, unexpected or unavoidable circumstances may include such things as serious illness of the claimant; death or serious illness in the claimant's family; destruction or damage of records; receipt of evidence after the hearing despite the claimant's active and diligent efforts to secure it earlier; or, receipt of a hearing decision on the record and the Administrative Council's review of that decision.  20 C.F.R. § 416.1470(b)(3).

The claimant has the burden to satisfy the good cause requirement before the Administrative Council is required to review a case when a Plaintiff submits new evidence not provided to the ALJ.  *See Baptista v. Comm'r of Soc. Sec. Admin.*, 2019 WL 4596771 at *9 (E.D. Cal. Sept. 23, 2019) (No. 1:18-cv-00844-JLT); *Schenone v. Saul*, 2019 WL 2994492 at *7 (E.D. Cal. July 9, 2019) (No. 2:18-cv-01655-AC); *Norbert S. v. Berryhill,* 2019 WL 2437457 at *10 (D. Or. June 11, 2019) (No. 6:18-cv-00218-AC ).   When the claimant fails to establish good cause, a district court properly declines to remand the action for further proceedings.  *See Baptista*, 2019 WL 4596771 at *9; *Schenone*, 2019 WL 2994492 at *7-8.

///

1   ///

2        In this case, Plaintiff failed to establish that the evidence met any of the bases for good

3   cause set out in 20 C.F.R. § 416.1435(b).  Accordingly, the Court declines to remand based on the

4   Administrative Council's determination not to review the post-hearing records.

5

6        **IX.    Conclusion and Order**

7        Based on the foregoing, the Court finds that the ALJ's decision that Plaintiff is not

8   disabled is supported by substantial evidence in the record as a whole and is based on proper legal

9   standards.  Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of

10   the Commissioner of Social Security. The Clerk of Court is directed to enter judgment in favor of

11   Defendant Andrew Saul, Commissioner of Social Security, and against Plaintiff Kenneth Franklin

12   Lowe.

13

14

15   IT IS SO ORDERED.

16        Dated:   **May 20, 2020**            **/s/ Gary S. Austin**
17                                  UNITED STATES MAGISTRATE JUDGE

18

19

20

21

22

23

24

25

26

27

28

22